NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0257n.06

No. 08-3551

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 22, 2011
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

KENNETH L. HUGHES,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

_____ /

BEFORE:    GUY, CLAY and McKEAGUE, Circuit Judges.

    **CLAY, Circuit Judge.** Defendant Kenneth Hughes appeals his conviction and sentence for

being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Defendant argues that

the district court incorrectly calculated his sentence when it refused to apply an offense level

reduction for acceptance of responsibility due to Defendant's pre-sentencing conduct. Defendant

also argues that the district court erred when it denied his motion to suppress the firearm.

    For the reasons set forth below, we **REVERSE** in part, and **AFFIRM** in part, the decision

of the district court.

**BACKGROUND**

**I.**    **Procedural History**

    On November 20, 2007, Defendant Kenneth Hughes was indicted on one count of being a

felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On January 20, 2008, Hughes

filed a motion to suppress the firearm.  After an evidentiary hearing, the district court orally denied the motion to suppress on February 5, 2008.

The next day, Hughes entered a conditional guilty plea, pursuant to a plea agreement. Hughes reserved the right to challenge the imposition of a sentence in excess of his properly calculated advisory sentencing range under the Sentencing Guidelines ("U.S.S.G." or "Guidelines"); he also reserved the right to appeal the district court's denial of his suppression motion.

In Hughes' plea agreement, the parties agreed that Hughes' base offense level would be set at 24, under U.S.S.G. § 2K2.1(a)(2).  The parties also agreed that the government would recommend that Hughes receive a three level reduction for acceptance of responsibility, "so long as Defendant's conduct continues to reflect his acceptance of responsibility."

On February 21, 2008, Hughes was arrested for drug possession and trafficking, and his bond was violated.

Hughes' Presentence Investigation Report ("PSR") reflected the base offense level of 24, as stipulated in the plea agreement.  The PSR did not reflect the three level adjustment for acceptance of responsibility.  Hughes had four criminal history points, which corresponded to a Criminal History Category III.  Therefore, the PSR recommended a Guidelines range of imprisonment of 63 to 78 months.

On April 22, 2008, the district court adopted the Guidelines range recommended in the PSR and sentenced Hughes to 70 months of incarceration.  Hughes now appeals both his sentence and the district court's denial of his motion to suppress.

## II.     Facts

On October 16, 2007, Cleveland Police Officers David Skrletts and Robert Januszewski (together, "the officers") observed a green Acura traveling on 143rd Street in Cleveland, Ohio. When the Acura accelerated from a stop at a traffic signal, the officers noticed that the car was emitting a thick plume of white smoke. At that time, Officers Skrletts activated the patrol car's signal and siren and, at 9:59 a.m., called the car's license plate number into police dispatch.[1]

The driver of the Acura, later identified as Defendant Kenneth Hughes, pulled the car over and the officers initiated the traffic stop. Both officers approached the vehicle, and Officer Skrletts asked Hughes for his driver's license and auto registration. Hughes responded by telling Officer Skrletts that his name was "Shadid Abdul Walid," but that he did not have identification or the car's registration.[2]

At that time, the officers requested that Hughes exit the vehicle. Hughes complied, Officer Skrletts performed a safety frisk, and then both officers escorted Hughes to the back seat of the patrol car, where he was placed. Once in the back of the patrol car, Hughes provided the officers with his real name and social security number. Officer Januszewski called the information into dispatch at 10:13 a.m., and one minute later the dispatcher reported that Hughes was driving under a suspended license.

---

[1]Cleveland police dispatch recordings indicate the call was made "on a roll," or while the officers were still following the Acura in their patrol car.

[2]Shadid Walid is Hughes' brother, who was also the legal owner of the vehicle.

According to the officers' testimony, Hughes was then "technically" arrested for driving under suspension ("DUS"), though neither officer informed him at that time. Officer Skrletts exited the cruiser and began an inventory search of the Acura in preparation for a tow. During this inventory, Officer Skrletts discovered a firearm under the front seat of the car. Shortly thereafter, the officers informed Hughes that he was under arrest for a concealed weapons violation. They then removed Hughes from the back seat of the cruiser, handcuffed him, and placed him back in the patrol car.

Later that day, Officer Skrletts completed a field report and a "vehicle/tow supplement" relating to the arrest. In that report, Officer Skrletts noted the time of arrest as 10:05 a.m. Officer Skrletts also indicated "arrest" as the "reason for tow." In the same section of the form, Officer Skrletts identified violations of "43507a/437.20" as the arrest violations.[3]

While Hughes largely agrees with the rendition of events given by the officers, he notably differs in his claim that Officer Skrletts began to search the Acura "almost instantly" after he was placed in the patrol car. According to Hughes, he did not provide the officers his real name until they had already discovered the weapon, and he only did so to prevent his brother from being implicated in the gun charge. (R. 26: Hughes at 42.) Under this factual scenario, it would have been impossible for the officers to have received information about the DUS prior to conducting the search.[4]

_____

[3]Officer Skrletts testified that a "[v]iolation 435.07A is driving under suspension, and 437.20 would be the excessive smoke." (R. 26: Skrletts at 15.)

[4]The district court found the officers' testimony regarding the order of events more credible than that of Hughes. The timing of the radio calls to dispatch also largely supports the officers'

## ANALYSIS

I.      **Sentencing: Reduction for Acceptance of Responsibility**

A.      **Standard of Review**

We review the district court's legal conclusions regarding the appropriate application of the Sentencing Guidelines *de novo*. *United States. v. Montanez*, 442 F.3d 485, 488 (6th Cir. 2006). We may reject the district court's determination on the "purely factual components of the acceptance of responsibility determination" only if it is clearly erroneous. *United States v. Bolden*, 479 F.3d 455, 464 (6th Cir. 2007).

B.      **Application**

Under the Guidelines, a defendant is entitled to a two level reduction to his base offense level if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The defendant may qualify for an additional one level reduction if, among other criteria, the defendant "timely notifie[s] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate resources efficiently." U.S.S.G. § 3E1.1(b). The additional reduction outlined under subsection (b) may only be granted upon motion of the government. *Id.*

In the instant case, Hughes entered a conditional guilty plea the day after his motion to suppress the firearm was denied. As a prerequisite for timely pleading guilty, Hughes executed a

---

version of events. "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir.1999). We are not left with a conviction of that strength.

plea agreement with the government wherein the government "agree[d] to recommend a three level reduction for the acceptance of responsibility under 3E1.1(a), so long as the defendant's conduct continue[d] to reflect his acceptance of responsibility."

Approximately two weeks after Hughes entered his plea, he was observed by law enforcement officials dealing drugs on the streets of Cleveland. Officers arrested him on February 21, 2008, and he was indicted on drug possession and trafficking charges on March 17, 2008. At Hughes' sentencing for the instant offense, the district court used this post-plea, pre-sentencing drug conduct to justify not applying a reduction to Hughes' offense level for acceptance of responsibility.

Hughes now argues that "[t]he district court erred by using [his] unrelated post-plea drug arrest to deny acceptance of responsibility for the firearms offense." The government acknowledges this error and "concedes that this Court should remand to the district court for re-sentencing so that the district court may have the opportunity to correct the error and to make a final determination about what is an appropriate sentence in this case." We agree that the district court erred when it failed to apply the three level acceptance of responsibility reduction to Hughes' offense level, and consequently improperly calculated his advisory Guidelines range.

We have consistently held that "consideration of unrelated post-plea charges as a factor in determining whether the defendant ha[s] accepted responsibility for the sentencing offenses was improper." *United States v. Ackerman*, 246 F. App'x. 996, 999 (6th Cir. 2007) (citing *United States v. Banks*, 252 F.3d 801, 807 (6th Cir. 2001)); *see also Banks*, 252 F.3d 801 (holding that post-plea conduct of assault and destruction of property could not be considered under U.S.S.G. § 3E1.1 for sentencing on drug trafficking and firearm possession charges); *United States. v. Morrison*, 983 F.2d

730 (6th Cir. 1993) (finding post-plea conduct of theft and drug use unrelated to the firearms offense for which defendant was being sentenced).

Hughes' post-plea conduct of drug dealing is "wholly distinct" from his illegal possession of a firearm. *See Morrison*, 983 F.2d at 733. Hughes was arrested for making a hand-to-hand sale of crack cocaine to a confidential informant. At the time of his arrest, he was found to be in possession of the "buy" money, an additional $80 and a piece of paper on which several phone numbers were written. There is no allegation that Hughes possessed or utilized a firearm as part of this activity.

Consequently, the district court erred when it declined to apply the three level reduction for Hughes' acceptance of responsibility, as contemplated in his plea agreement. Proper application of the reduction would have yielded an adjusted offense level of 21 and an advisory Guidelines range of 46 to 57 months of imprisonment.

### C.    Conclusion

Because the district court erred in calculating Hughes' advisory sentencing range, we **VACATE** the district court's sentence, and **REMAND** the case for resentencing in accordance with this opinion.

## II.    Conviction: Motion to Suppress the Firearm

### A.    Standard of Review

We review the factual basis of a district court's denial of a motion to suppress evidence for clear error, and its legal conclusions *de novo*. *United States v. Davis*, 430 F.3d 345, 351 (6th Cir.

2005). "In reviewing the district court's findings of fact, we consider evidence in the light most favorable to the government." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

**B.      Analysis**

Hughes argues that the district court erred in denying his motion to suppress the firearm because, while "[t]he firearm was recovered during what was purportedly a search incident to an arrest for a traffic misdemeanor . . . Mr. Hughes was never arrested for the traffic violation that supposedly prompted the search," rendering the search of Hughes' vehicle "unreasonable under the Fourth Amendment." Alternatively, Hughes argues that the police officers at the scene diverged from departmental policy regarding inventorying a car in preparation for a tow, so "[t]he search cannot be justified as a non-arrest inventory search."

We find that it is not necessary for this Court to reach the issue of whether a vehicle search incident to arrest would have been valid under the Fourth Amendment, as the search of Hughes' vehicle was reasonable pursuant to the inventory exception to the warrant requirement of the Fourth Amendment.

**1.      Whether Hughes was Placed Under Arrest Prior to the Search**

"The federal standard under the Fourth Amendment for an arrest or seizure involves determining whether 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. 2002) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (arrest occurs when "taking into account all of the circumstances surrounding the encounter, the

police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.")

Hughes argues that "[t]he record reflects that the officers only arrested Mr. Hughes for the firearm they found during the search, but never arrested Mr. Hughes for the traffic offense." In support of the claim that he was not arrested for the DUS, Hughes highlights the fact that the officers did not inform him, at the time that dispatch reported the DUS, that he was under arrest. Hughes argues that *Stansbury v. California*, 511 U.S. 318, 325 (1994), stands for the proposition that a necessary component of effectuating an arrest is that an officer inform the suspect that he is officially under arrest.

*Stansbury* does not support Hughes' argument. Instead, *Stansbury* addresses a police officer's subjective perspective regarding whether a person is in custody, as it applies in the context of the Fifth Amendment and the duty to provide a *Miranda* warning. Clearly, these are not the issues present in this case.

In the context of the Fourth Amendment, it is clear that "[i]t does not take formal words of arrest or booking at a police station to complete an arrest. It simply takes the deprivation of liberty under the law." *Manning v. Jarnigan*, 501 F.2d 408, 410 (6th Cir. 1974). Furthermore, "[i]t is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime . . . ." *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

Hughes does not argue that the officers lacked probable cause to arrest him after they became aware of the DUS. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his

presence, he may, without violating the Fourth Amendment, arrest the offender."). Instead, he argues that the officers made the discretionary choice to arrest him only on the firearm offense, and to issue a citation for the arrestable DUS offense.[5]

The facts, when viewed in the light most favorable to the government, show that while Hughes was not under arrest when the officers initially placed him in the rear of the patrol car, he was placed under arrest when the officers received the information from dispatch that his license was suspended. The weight of the evidence supports this conclusion. First, when the officers discovered that Hughes was DUS, they did not proceed by issuing Hughes a citation and releasing him. Nor did they inform him that they were only citing him for the DUS; instead they gave him no information at all. Secondly, after learning of the DUS, the officers began the procedures for an inventory search and they called for a tow truck. Thirdly, Officer Skrletts completed the requisite field report and tow supplement, which was behavior consistent with an inventory search. Finally, it is clear that Hughes did not have liberty to leave or ignore the officers after they learned of his DUS. Each of these facts is consistent with the testimony of the officers and the field report, as further discussed below.

Therefore, we find that the officers arrested Hughes upon receiving probable cause that he was driving under suspension. The remaining question is whether Officer Skrletts's inventory search, which uncovered the illegal firearm, was performed pursuant to a standardized policy.

---

[5]We note that a person may be arrested, but not later charged, for a crime. Therefore, whatever results occur subsequent to an arrest are not dispositive of the question of whether an arrest occurred.

**2.      Whether the Inventory Search was Violative of the Fourth Amendment**

It is well-established that a warrantless search of a vehicle, if it is done pursuant to an inventory and not for investigative purposes, may be reasonable under the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *see also South Dakota v. Opperman*, 428 U.S. 364 (1976); *United States v. Tackett*, 486 F.3d 230 (6th Cir. 2007). When such inventory searches are conducted pursuant to standardized procedures, those "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Bertine,* 479 U.S. at 374.

A police department's "policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Florida v. Wells*, 495 U.S. 1, 4 (1990) (internal quotations omitted). Yet, while "officers do not enjoy their accustomed discretion" in conducting an inventory, they "may exercise some judgment based on concerns related to the purposes of an inventory search . . . ." *Tackett*, 486 F.3d at 232. Those purposes are, among other things, "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372.

Hughes argues that the officers failed to conduct an inventory search in accordance with the standard procedures established by the Cleveland police department, because they did not 1) attempt to contact the legal owner of the vehicle, or 2) remove valuables from the vehicle before the tow.

The Cleveland Police General Order on Vehicle Tow or Release ("Tow Policy") sets forth the guidelines for officers ordering the tow of a vehicle. The Tow Policy is structured in the following manner: the first section (including subsections "A" through "G") outlines the general tow policies. The immediately following section describes the towing officer's processing (forms that must be completed) and communication control (information that must be radioed to dispatch) duties. Next are sections that set forth additional procedures that must be completed for specific types of tows— for "fatal and serious non-fatal accidents," "emergency tows," and "towing vehicles for safekeeping." The Tow Policy then outlines the conditions under which a tow can be cancelled and the vehicle released at the scene. In the final sections, the Tow Policy sets forth special procedures for abandoned and "junk" vehicles.

It is clear from the "Vehicle/Tow Supplement" to the standard Cleveland field report that an officer may order a tow for an arrest. (App. 12 (Under "Reason for Tow" form lists "arrest" as one of twelve bases for ordering the tow).) When an officer determines that a car will be towed for arrest, the first section of the Tow Policy applies. Under this section, an officer is required to: 1) complete a "Vehicle/Tow Supplement Form"; 2) obtain a vehicle check from the district dispatch or mobile data computer; 3) complete the "vehicle damage" section of the supplement; and 4) complete an inventory of items in the vehicle.

Turning to Hughes' first argument, the Tow Policy is clear that officers are only required to attempt to contact the legal owner of a vehicle when the vehicle is being towed for safekeeping. The Tow Policy defines a safekeeping tow as one where the vehicle is "legally parked and in danger of damage by obstructing safety forces or public works." Hughes apparently misunderstood the

12

testimony of Officer Skrletts, who reiterated throughout both direct and cross-examination that the tow of Hughes' car was incident to the arrest, and was not for safekeeping. (R. 26: Skrletts at 26-27 ("Q. Would this be what I refer to as a safekeeping tow, meaning he couldn't leave the car there? A. This is a tow for an arrest."); *id.* at 36-37 ("Q. Was this vehicle being towed for safekeeping? A. No. This vehicle was being towed because the person in control of the vehicle was under arrest").)

In addition to Officer Skrletts' testimony that Hughes' car was not towed for safekeeping, there is no indication that Hughes' vehicle met the other criteria for a safekeeping tow. Therefore, the officers were not required to attempt to contact the legal owner of the vehicle in order to properly effectuate the tow under the Tow Policy.

Hughes also argues that Officer Skrletts failed to follow the Tow Policy because he did not remove Hughes' valuables from the car. Section I, subsection G of the Tow Policy states, in relevant part, that "[i]f possible, prior to towing, remove from the vehicle property such as jewelry, cameras, radios, televisions, golf clubs, cellular phones, computers, radar detectors or other valuables." Officer Skrletts testified, and the vehicle inventory reflects, that he noted the presence of "loose DVDs and a player, DVD player in the passenger compartment. . . . [and] a CD changer in the trunk." It is undisputed that the officers did not remove any of these items from the car.

The government argues that the "tow policy authorizes, rather than mandates, that certain valuables be removed from the vehicle." While this argument is technically correct, it is somewhat less than compelling. More convincing is Officer Skrletts' testimony, wherein he explained that the practice of the Cleveland police department is to interpret the phrase "where possible" to refer only

to removing items "at the request of the owner."[6] Otherwise, Officer Skrletts testified, the department interprets the policy to leave it to the towing officer's discretion to either remove the property, or document it on the inventory supplement form, as "the vehicle inventory is an inventory of things left in the vehicle." (R. 26: Skrletts at 17.) *See United States v. Lumpkin*, 159 F.3d 983, 987-88 (in the absence of written policy in the record, crediting officer's testimony regarding standard operating procedure). This reading of the policy is consistent with the stated purpose of conducting the inventory, which is "to protect citizens and the division from false claims."

Furthermore, because Defendant has "failed to demonstrate that the officers impounded and inventoried the car 'in bad faith or for the sole purpose of investigation,' the inventory search was properly held lawful." *United States v. Hurst*, 228 F.3d 751, 758 (6th Cir. 2000) (citing *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir.1994)). There is no indication that Officer Skrletts acted in bad faith or that there was a serious departure from the requirements of the Tow Policy, considered in its entirety, sufficient to show that the inventory search was "a pretext concealing investigatory police motive." *Opperman*, 428 U.S. at 376.

Consequently, we find that the officers performed the inventory search pursuant to the written policies of the Cleveland police department, which comply with Fourth Amendment requirements for a warrentless inventory search.

---

[6]Under this interpretation, "where possible" is understood to mean when, at the time of the inventory and tow, there is someone available on the scene who is willing to take possession and store the valuables for the owner.

**C.      Conclusion**

Because police had probable cause to arrest Hughes for driving under suspension, and did effect an arrest for that offense; and because they conducted an inventory search in accordance with the standardized tow policy of the Cleveland police department, the requirements of the Fourth Amendment are satisfied.  Thus, we find that the district court did not err in denying Hughes' motion to suppress the firearm, and we **AFFIRM** its decision.

## CONCLUSION

The district court did not err in denying Defendant's motion to suppress the firearm, and we hereby **AFFIRM** its suppression decision.  We **VACATE** the sentence imposed by the district, and **REMAND** the case to the district court for resentencing.