**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0405n.06

Nos. 10-5636, 10-5644

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Apr 13, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| MICHAEL ROY REDMOND and | ) | EASTERN DISTRICT OF KENTUCKY |
| CASEY M. REDMOND, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE:  GUY, KETHLEDGE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  Michael and Casey Redmond were indicted on charges arising from their participation in a methamphetamine manufacturing operation.  Michael Redmond ("Michael") entered a conditional guilty plea after the district court denied a motion to suppress evidence seized from his vehicle.  Casey Redmond ("Casey") pleaded guilty to possession of methamphetamine, and possession of a listed chemical with the knowledge it would be used to manufacture methamphetamine.  Michael appeals the denial of the motion to suppress, and Casey appeals his sentence.  We **AFFIRM** as to both defendants.

**I.**

In December 2007, Officer Scott Whitaker of the Lake Cumberland Area Drug Task Force in Somerset, Kentucky ("Task Force") went to the home of Michael Redmond to investigate a

complaint that Michael had attempted to steal lithium batteries from a Wal-Mart. There, he encountered Casey, Michael's Son, who claimed to be Casey's brother Cornelius, and Ami Beckman. Casey and Ami Beckman admitted to knowing that Michael produced methamphetamine and admitted to buying psuedoephedrine for Michael with the knowledge that he would use it to produce methamphetamine. They also told Officer Whitaker that various other family members, including Casey's mother Nannette Redmond ("Nannette"), bought products for Michael to assist in manufacturing methamphetamine. Whitaker also smelled a "strong chemical odor around the residence," and seized a small amount of methamphetamine and a small bag of marijuana. Michael was not present during Whitaker's visit to the Redmonds' address.

Several months later, on July 27 2008, David Gilbert, the Director of the Task Force, received a call from a Lowe's store employee, who advised Gilbert that a white female had just purchased two canisters of "yellow bottle lye, drain cleaner." Gilbert understood the caller to be referring to Roebic brand sodium hydroxide 100 percent, which Gilbert testified he had only encountered in the Lowe's store in question and in methamphetamine labs. Gilbert testified he had one canister of drain cleaner at home, which had lasted him ten years, so he found the purchase of two canisters unusual. The caller gave a detailed physical description of the purchaser and noted that she had "iodine-coated fingers," which Gilbert found significant because iodine is "normally utilized in a red phosphorus lab for the manufacture of methamphetamine." The caller also provided a description of the purchaser's pick-up truck as well as its license-plate number. Gilbert ran a registration check and discovered it was registered to a Michael Redmond living at 311 Breezy Hills, Somerset, Kentucky. Gilbert was aware that the Task Force and the DEA had been investigating a

Michael Redmond "for several years now," the Task Force had two agents assigned to complaints regarding Michael Redmond, and the DEA had provided reports to the Task Force concerning his involvement in drug trafficking.  Gilbert testified the Task Force "continually get[s] complaints about Mike Redmond and his manufacturing methamphetamine and trafficking."

After receiving the tip from the Lowe's employee, Gilbert contacted Officer Whitaker regarding the status of the Michael Redmond investigation.  Whitaker told Gilbert that the woman in the pick-up truck was probably Nannette and confirmed the Redmonds' address.  Whitaker then told Gilbert about the information he gathered during his December 2007 investigation of the Redmonds' address, and that Nannette had a drug-paraphernalia conviction and had been arrested in the past for possessing a concealed weapon.  Gilbert also knew that Michael had prior drug convictions.

After speaking with Whitaker, Gilbert drove toward the Redmonds' address and caught up with the pick-up truck just as it was entering the subdivision, following it as it pulled into the driveway of the Redmonds' address.  Gilbert then got out of his vehicle, identified himself to the driver, and asked her for identification.  Nannette provided her driver's license, which listed the Redmonds' address at which they were parked, and Gilbert noted at that time that she matched the description provided by the Lowe's employee.

Gilbert told Nannette that he was a police officer and asked if she would consent to a search of the truck, which Nannette refused.  Michael then came out of his garage and also refused to consent to a search of the truck.  Gilbert noticed that the Redmonds' garage was burned out with the entire roof missing, and contained graffiti showing a skull and the words, "Not responsible for

-3-

accidents." Gilbert called 911 and requested assistance, and two Pulaski County Sheriff's Deputies arrived within minutes. At Gilbert's request, the deputies conducted a safety sweep of the Redmonds' residence and reported that no one was inside. Gilbert then asked the deputies to supervise Nannette and Michael as he approached the truck and peered through the passenger-side window. Upon looking inside, Gilbert saw an orange posterboard that obscured part of a plastic bag, within which he could see approximately one inch of what resembled a yellow spray paint can. Gilbert strongly suspected it was Prestone starting fluid because he knew it to come in a yellow can and had seen it in many methamphetamine labs.

Gilbert then opened the door to the vehicle, lifted the posterboard and found three cans of Prestone starting fluid, ether, and a can of what he thought may have been iodine. Gilbert then placed Nannette under arrest, advised her of her rights, and asked her the location of the drain cleaner. Nannette responded that the drainer cleaner was "in the tool box in the back," and Gilbert found two canisters of drain cleaner in a tool box in the back of the vehicle. When Gilbert asked Nannette what she was going to do with the chemicals, she said she was just stopping by on her way to take the chemicals to a friend. When he challenged this claim, she told him that she was going to use the chemicals to "cook." Gilbert reported his observations to Whitaker upon his arrival, and Whitaker prepared a search warrant affidavit and obtained a search warrant from a Pulaski County District Court judge. The execution of the search warrant yielded evidence of the manufacture of methamphetamine, including finished product methamphetamine, pseudoephedrine tablets, lithium batteries, tinctured alcohol, iodine, and salt.

Michael, Casey, Nannette, and Ami Beckman were all indicted for conspiracy to manufacture methamphetamine. After a suppression hearing, a magistrate judge found that the search of the vehicle was not justified as a *Terry* search or as a search conducted pursuant to the safety-based warrant exception. However, the magistrate judge found that probable cause supported the vehicle's search under the automobile exception to the warrant requirement, and because defendants did not argue that the warrant application in its entirety, including the evidence obtained from the truck, failed to provide probable cause to search the house, the magistrate judge upheld the search of the Redmonds' residence as well. The district court adopted the recommended disposition in its entirety. Michael entered a conditional plea to Count 1 of the superseding indictment—conspiracy to manufacture 50 grams or more of a mixture of substance containing a detectable amount of methamphetamine, 21 U.S.C. § 846, and timely appealed the denial of the motion to suppress.

Casey agreed to plead guilty to one count of being in possession of a listed chemical with knowledge that it would be used to manufacture a controlled substance, 21 U.S.C. § 841, and one count of simple possession of methamphetamine, 21 U.S.C. § 844, in exchange for the dismissal of other counts. The plea agreement noted that Casey and the government had reached the following agreement regarding an acceptance-of-responsibility adjustment:

> Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

(Plea Agreement, R. 200, at 3.)

On May 17, 2010, Casey appeared for sentencing. Earlier that day, Ami Beckman's attorney provided the government with a letter that was purportedly written from Casey to Beckman on December 2, 1999, after Casey had pleaded guilty. The letter apparently indicated that Casey sought to obtain drugs while in pre-trial detention, and provided detailed instructions to Beckman on how to smuggle the drugs to him. Casey's counsel was given the letter just prior to sentencing. He objected to its consideration on the basis that he had not had a chance to verify whether it was actually written by Casey.

Over Casey's objection, and on the basis of the letter, the court removed the three-level reduction, thus bringing Casey's recalculated total offense level to 28, and increasing the advisory guideline range from 70–87 months to 97–121 months. Casey was sentenced to 100 months, and timely appealed.

## II. Motion to Suppress

A. Standard of Review

In a challenge to a district court's ruling on a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Purcell*, 526 F.3d 953, 959 (6th Cir. 2008). Whether a seizure is reasonable under the Fourth Amendment is a question of law that is reviewed *de novo*. *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009). In reviewing a denial of a motion to suppress, we consider the evidence in the light most favorable to the government. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). This court may affirm a denial of a motion to suppress on any grounds, not just those relied on by the district court. *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994).

B. Probable Cause

Under the automobile exception to the warrant requirement, "an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998). Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Id.* (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* In determining whether probable cause exists, we look to the objective facts known to the officers at the time of the search. *Id.* at 1075. Probable cause for arrest may emanate from collective police knowledge. *See United States v. Perkins*, 994 F.2d 1184, 1189 (6th Cir. 1993) (finding that probable cause existed as a matter of the collective knowledge of all the officers and agents investigating a case).

Michael argues that the collective knowledge of the law enforcement officers did not establish probable cause to conduct the warrantless search of the vehicle because many of the facts supporting probable cause were either stale or were based on uncorroborated information from an unreliable informant. The relevant facts collectively known to police at the time of the warrantless search were the following:

(1) In December 2007, after receiving a tip from a Wal-Mart employee that Michael Redmond had stolen lithium batteries, Whitaker conducted a search of the Redmond home and discovered small amounts of methamphetamine and marijuana.

(2) During that visit, Whitaker interviewed Ami Beckman and Casey Redmond, who lied to Whitaker by claiming to be his brother Cornelius. Ami and Casey implicated themselves, Nannette, and Michael in a methamphetamine manufacturing operation.

(3) During that visit, Whitaker smelled a strong chemical odor around the residence.

(4) On July 27, 2008, the day of the warrantless search, a Lowe's employee provided a tip that someone matching Nannette Redmond's description and driving the vehicle in question purchased two canisters of drain cleaner, which Gilbert associated with meth production.

(5) The description included reference to the female's "iodine fingers," which Gilbert associated with meth production.

(6) The vehicle was registered to Michael Redmond at the address at which Gilbert encountered the vehicle.

(7) The Task Force had been investigating Michael Redmond for multiple years and had received multiple complaints.

(8) Gilbert noticed the Redmonds' garage was burned out with the entire roof missing, and it contained graffiti of a skull and the words, "Not responsible for accidents."

(9) Through the window of the vehicle searched, Gilbert could see one-inch of a yellow can that he suspected was Prestone brand starting fluid, which Gilbert knew to come in a yellow can and which he associated with methamphetamine production.

### 1. Staleness

Facts that at one time supported probable cause can over time become stale where they are not "so closely related to the time of the [search] as to justify a finding of probable cause at that

time." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). The dissipation of probable cause is determined by various factors including "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?) the place to be searched (mere criminal forum of convenience or secure operational base?)." *Id.* (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "The passage of time is less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime." *Id.* (citations omitted). Furthermore, "information from an informant that is otherwise stale may be refreshed if the affidavit contains recent information that corroborates otherwise stale information." *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010) (citation, alteration, and internal quotation marks omitted).

Generally, "[i]n the context of drug crimes, information goes stale very quickly because drugs are usually sold and consumed in a prompt fashion." *See United States v. Brooks*, 594 F.3d 488, 493, 494 n.4 (6th Cir. 2010) (citations omitted) (holding that information regarding six-month old drug transactions was stale for purposes of establishing probable cause). However, drug crimes that are long-term operations, like marijuana growing, "may allow for greater lapses of time between the information relied upon and the request for a search warrant." *Thomas*, 605 F.3d at 310 (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)).

Here, with respect to the character of the crime, evidence of the manufacture of methamphetamine is closer to a regenerating conspiracy than a chance encounter in the night. On the continuum of long- versus short-term criminal operations, the manufacture of methamphetamine

lies somewhere between growing marijuana and selling or consuming drugs. The speed at which methamphetamine is manufactured depends on how quickly a variety of ingredients are gathered and mixed, but evidence of methamphetamine manufacturing is rarely as ephemeral as evidence of mere consumption of or transaction in drugs.

As to the nature of the criminal, all of the manufacturing took place in the Redmonds' residence, and therefore the alleged criminals were entrenched rather than nomadic. With respect to the third factor, although the goods to be seized were common household items that are easily transferable, there is no indication that the methamphetamine lab was mobile. Therefore, the evidence may have been likely to be there for an indefinite period of time. *See United States v. Hammon*d, 351 F.3d 765, 772 (6th Cir. 2003) (finding that evidence of marijuana plants from an indoor grow operation was "likely to be there for an indefinite period of time").

Finally, with respect to the place searched, although the warrantless search was conducted on a mobile vehicle rather than a secure operational base, the vehicle was registered to Michael Redmond at the address where it was parked when it was searched. The vehicle was thus searched directly outside of the residence where the drug manufacturing allegedly occurred after traveling there from a store where its driver allegedly made suspicious purchases. The prior evidence of a methamphetamine manufacturing operation supports probable cause for the search of the vehicle more so than if the vehicle was stopped in another location or had not traveled directly to the Redmonds' residence.

2. Reliability of December 2007 Interviews

Michael also claims that the statements by Casey and Ami Beckman are unreliable and cannot support a probable cause finding. In support of this contention, he argues that the statements are similar to the tips from the informant in *United States v. Perkins*, 994 F.2d 1184 (6th Cir. 1993). In *Perkins*, an individual voluntarily told law enforcement agents that the defendant had approached her about participating in criminal activity. Then, with the agents' knowledge, she assisted the defendant in transporting and distributing marijuana, and along the way provided the agents with information needed to help them obtain probable cause to conduct a search. *Id.* at 1186–87. The defendant attacked the informant's reliability, arguing that the government was required under *Spinelli v. United States*, 393 U.S. 410 (1969), to demonstrate the informant's basis of knowledge for the information as well as her credibility. *Perkins*, 994 F.2d at 1187–88. We rejected Perkins' argument on the basis that in *Illinois v. Gates*, 462 U.S. 213, 230 (1983), the Supreme Court replaced the two-prong test in *Spinelli* with a more flexible standard, whereby the two *Spinelli* prongs "should not be understood as entirely separate and independent requirements to be rigidly exacted in every case," but instead "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Perkins*, 994 F.2d at 1188 (quoting *Gates*, 462 U.S. at 230). In *Perkins*, this Court found there was "every reason" to believe the information provided by the informant was reliable, noting that the informant was known, that she had explained the basis of her information, that she voluntarily approached law enforcement with the information, and that law enforcement had independently corroborated information she had provided. *Id.*

Contrary to what Michael contends, we neither established nor applied a rule that, for information from an informant to be sufficiently reliable, "1) there must be an explanation for the basis of the informant's information; and 2) the information offered by the informant must be independently corroborated by a police investigation." (Michael Redmond's Br. at 16–17.) Nevertheless, the fact that such basis and corroboration existed in *Perkins* were relevant factors that we considered in determining there was probable cause.

Here, Casey and Ami Beckman have a clear basis for their information. They were known individuals, rather than anonymous informants, who lived in the same house as Michael and claimed to have assisted him in procuring ingredients for the manufacture of methamphetamine. Further, the police knew Michael had attempted to steal lithium batteries from a Wal-Mart, smelled a strong chemical odor around the residence, and seized finished methamphetamine from their home. There existed, therefore, some evidence corroborating the information provided by Ami Beckman and Casey. The reliability of the information is discounted somewhat because unlike the informant in *Perkins*, Casey and Ami Beckman did not voluntarily come to the police with information, and because Casey lied to the police and told them he was his brother Cornelius. But this indicates that Casey was attempting to escape responsibility more than it suggests the information provided regarding Michael should be considered altogether unreliable.

### 3. Analysis

The relevance of any individual piece of information gathered in December 2007 to the probable cause determination cannot be measured in a vacuum, but rather must be viewed together and in totality with the events immediately preceding the search. *See Thomas*, 605 F.3d at 308.

Recent events can serve to refresh otherwise stale information, *Thomas*, 605 F.3d at 310, and corroborate information provided by an informant. *Perkins*, 994 F.2d at 1188.

On the day of the warrantless search, in addition to the information he knew about Agent Whitaker's prior investigation—during which Casey stated, among other things, that his mother Nannette had gathered meth ingredients for Michael in the past—Gilbert learned that someone matching Nannette's description and driving Michael's vehicle had purchased, and then brought to the house, two canisters of Roebic drain cleaner, which Gilbert associated with meth production. He also knew that the Task Force had investigated Michael for multiple years and had received multiple complaints that he manufactured methamphetamine.  Gilbert also saw what he strongly suspected was Prestone brand starting fluid, which Gilbert also associated with meth production, in the vehicle.

To the extent a question exists about the staleness of the information gathered in December 2007, and the reliability of the interview with Casey and Ami Beckman, the facts gathered on the day of the warrantless search were sufficient to refresh the old information and corroborate the interview. When the new information is viewed together with the information gathered in December 2007, and when all of the evidence is viewed in the light most favorable to the government, Gilbert had probable cause to believe the vehicle contained evidence of methamphetamine production.  We therefore conclude the warrantless search of the vehicle was lawful.  Accordingly, we need not decide whether, in the absence of the information obtained from the search of the vehicle, the search warrant application provided probable cause for the search of Michael Redmond's residence.

### III.  Continuance

Casey argues that his sentence must be vacated because the district court violated due process

by failing to grant a continuance so his attorney could review the letter provided to him immediately

prior to sentencing and which formed the basis for the decision not to grant the two-level reduction

for acceptance-of-responsibility that was recommended in the Presentence Report.  The government

responds that Casey waived this objection by implicitly refusing the court's offer to continue the

sentencing hearing.

After defense counsel objected to the consideration of the letter, the court responded:

> Well, we could proceed in a couple of different ways.  One is we could continue the sentencing as it relates to Mr. Casey Redmond, and I would presume that we could, without too much difficulty, either authenticate the letter or not.  I mean, it's either going to be a letter from him – I mean, it has pretty high level of credibility with me right now, given that it comes from Ami Beckman.  Her counsel presumably received it from her.  She received it from someone.  You're speculating that maybe someone was, in essence, trying to set up your client.  But I don't think it would be too difficult to be able to show at least by a preponderance of the evidence that that is either in his handwriting or consistent with what he would have sent.  If nothing else, the co-defendant in this case could, I would assume, authenticate it in essence in terms of the handwriting in this case, so we could go through that process, I suppose.
>
> On the other hand, I don't know that the government's going to do anything other than simply, based on what they believe the letter to purport, to not move for the third level of acceptance.  That's within their discretion to do it.  At the appropriate time, I could allow you to argue against that, kind of for the same reasons.  You, in essence, are arguing that they ought not to do that, but that's their decision to do it, absent the decision by the United States to move for the third level, I don't have the discretion to give it.  That's within their discretion.  And so it's contemplated.  It was expected that it would be given, but I think it's fair for them to consider this letter. I think it's very fair for them to consider this letter and appropriate for them to do in terms of making that appropriate motion.

(Sentencing Transcript, R. 229, at 11–13.)

Defense counsel answered, "Okay" and did not request a continuance at that time.  On the basis of the letter, the government did not move for the one-level reduction for assisting in the investigation or prosecution of one's own misconduct under U.S.S.G. § 3E1.1(b).  The government additionally requested that Casey not receive the two-level reduction for acceptance-of-responsibility under U.S.S.G. § 3E1.1(a), arguing that the letter demonstrated Casey had taken "it upon himself to engage in additional criminal conduct, to keep being involved in narcotics." (*Id.* at 17.)

Defense counsel responded that even assuming the letter was valid, Casey deserved the two-level reduction for accepting responsibility for the actions for which he was charged.  The court sided with the government, finding that the letter was not "the kind of conduct that suggests somebody has indicated remorse, has indicated acceptance of responsibility for the drug crimes they've been part of, and the continued use of those narcotics." (*Id.* at 22.)  Casey now argues that the court led the defense into believing the two-level reduction for acceptance-of-responsibility would be allowed and that only the third point for acceptance might be lost, "thus misleading the defense from requesting a continuance."  (Casey Redmond's Br. at 11.)

While the district court did not specifically ask whether Casey wanted a continuance, it was clearly presented as a possibility and Casey was provided with an opportunity to respond.  Defense counsel apparently agreed with the district court's recommended course of conduct.  And although the district court seemed to pull a bait-and-switch by implying initially that the letter would not affect Casey's two-level reduction for acceptance-of-responsibility, the court was noncommittal on that point, stating only that it did not *know* that the government would do anything beyond not moving for the one-level reduction.  Once it became clear that the government took the position that Casey

should not get any credit for acceptance-of-responsibility, defense counsel had an opportunity to respond and again failed to ask for a continuance, instead using that opportunity to argue that despite the contents of the letter, Casey should receive the reduction for accepting responsibility for the crimes with which he was charged.

Therefore, we find that Casey Redmond waived his objection to being sentenced as scheduled and the district court did not err in refusing to grant a continuance of the sentencing.

## IV. Acceptance of Responsibility

Casey argues the district court erred in denying an acceptance-of-responsibility adjustment. This Court reviews the district court's acceptance-of-responsibility determination for clear error. *United States v. Brown*, 367 F.3d 549, 556 (6th Cir. 2004). Due deference is given to the district court's application of the Sentencing Guidelines to the facts. *United States v. Webb*, 335 F.3d 534, 537 (6th Cir. 2003).

Section 3E1.1(a) of the Sentencing Guidelines states that, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). To qualify for the reduction, a defendant must show "by a preponderance of the evidence that [he or she] had accepted responsibility for the crime committed." *United States v. Thomas*, 74 F.3d 701, 716 (6th Cir. 1996). "An acceptance of responsibility adjustment is generally awarded to a defendant who admits guilt at a timely-entered guilty plea proceeding and may not be disallowed unless there is conduct clearly demonstrated in the record that is inconsistent with the defendant's specific acknowledgment of responsibility demonstrated by the guilty plea." *United States v. Truman*, 304 F.3d 586, 592 (6th Cir. 2002).

Application Note 1 of the adjustment lists appropriate considerations for the reduction, and includes, *inter alia*, "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1, App. Note 1. In *United States v. Morrison*, we held that the phrase "voluntary termination or withdrawal from criminal conduct" refers to conduct which is of the same type or that is related to the underlying offense, and not illegal conduct generally. 983 F.2d 730, 735 (6th Cir. 1993). Thus, where a defendant who pled guilty to firearm possession charges was released on bond and subsequently arrested for attempting to steal a pickup truck, it was inappropriate for the district court to consider the theft against him in determining whether an acceptance-of-responsibility adjustment applied. *Id.* In describing criminal conduct that is "related to" the underlying offense, we approvingly cited cases in other circuits that denied the adjustment where, *inter alia*, a defendant whose underlying offense was a conspiracy to possess with intent to distribute cocaine subsequently used drugs while out on bond, *see id.* at 734 (citing *United States v. Davis*, 878 F.2d 1299, 1300-01 (11th Cir.)), and where the criminal conduct was evidence that the defendant "had not turned away from the lifestyle that had motived his offense." *Id.* at 734 (citing *United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir. 1989) (district court did not err in finding continued use of cocaine demonstrated defendant had not turned away from lifestyle that motivated his postal theft offenses).

Here, Casey's letter suggests that he attempted to persuade a co-defendant to assist him in smuggling drugs into prison. This conduct is clearly related to Casey's underlying offense because both the underlying offense and the new conduct are methamphetamine-related, and because the attempted smuggling is evidence that Casey had not turned away from the lifestyle that had motivated his offense.

Casey argues that the letter is evidence of his drug problem and does not indicate less remorse for his involvement in drug-trafficking offenses. Casey relies in part on an unpublished case, *United States v. Ackerman*, 246 F. App'x 996 (6th Cir. 2007). In *Ackerman*, this Court found that where a defendant pleaded guilty to firearms charges, and misdemeanor drug possession charges were dropped as part of the plea agreement, the district court committed error by denying the acceptance-of-responsibility adjustment on the basis that defendant failed to accept responsibility for the marijuana possession and subsequently used marijuana while out on bond. *Id.* at 999. *Ackerman* is distinguishable, however, because here both the underlying offense and the subsequent conduct were drug-related. Casey cites no authority for the proposition that the commission of conduct related to the underlying offense is not a basis to deny the acceptance-of-responsibility adjustment where the new conduct is evidence of drug addiction.[1] On the contrary, Casey's letter suggests he has not turned away from the lifestyle that led to his original drug offense. Therefore, we find that the district court did not commit clear error in refusing to grant a two-level reduction for acceptance-of-responsibility.

Casey further argues the government was not at liberty to withhold a motion for a third point under U.S.S.G. § 3E1.1(b) because the plea agreement limited the government's discretion.

---

[1]At oral argument, Casey Redmond directed this court's attention to an unpublished case, *United States v. Hughes*, 420 F. App'x 533 (6th Cir. 2011). But in *Hughes*, the underlying sentence was for a firearms offense, and the post-plea conduct involved drug possession and drug trafficking. *Id.* at 536. This Court found that the district court erred in refusing to apply the three-level reduction because "Hughes' post-plea conduct is 'wholly distinct' from his illegal possession of a firearm." *Id.* (citing *Morrison*, 983 F.2d at 733). Like *Ackerman*, *Hughes* is distinguishable because here, both the underlying offense and the subsequent conduct are drug-related.

The relevant provision in the plea agreement states:

> Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

(Plea Agreement, R. 200, at ¶ 5.)

Casey's argument is unavailing because the plea agreement conditions the two-level decrease on the defendant not committing another crime. Although the second part of the paragraph does not explicitly include the same condition, under the Sentencing Guidelines the additional one-level decrease under U.S.S.G. § 3E1.1(b) is only granted if the defendant first qualifies for the two-level decrease under U.S.S.G. § 3E1.1(a). Therefore, the government did not violate the plea agreement by failing to move to decrease the offense by an additional level.

## V. Substantive Reasonableness

Casey finally argues that his sentence was substantively unreasonable. The reasonableness of a sentence is determined using the abuse-of-discretion standard of review. *United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007). Sentences within the applicable Guidelines range are afforded a presumption of reasonableness. *United States v. Vowell*, 516 F.3d 503, 509 (6th Cir. 2008). A sentence may be substantively unreasonable if the district court "selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Id.* at 510. An assertion that the

district court should have balanced the 3553(a) factors differently is beyond the scope of appellate review. *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008).

Casey argues his sentence was substantively unreasonable because the court did not consider various factors, including his drug addiction, age, his family's influence over him, and the fact that he admitted guilt upon initial confrontation by police and was truthful about the conduct of co-conspirators. But Casey's history of substance abuse, age, and the facts that his parents were methamphetamine addicts and co-defendants were all included in the pre-sentence report, which the district court indicated that it had reviewed, accepted, and adopted. Where such factors are included in a pre-sentence report that the district court has read and considered, the district court is not required to address each factor specifically. *See United States v. Wittingen*, 519 F.3d 633, 639 (6th Cir. 2008). In any event, the district court did extensively consider Casey's role in light of his parents' influence over him, at one point acknowledging, "It's hard to say no to your dad. I recognize there is a dynamic there that reflects the fact that this was your parents that you were enabling." (Sentencing Transcript, R. 229, at 64.) The court also discussed Casey's choices in light of his addiction. The court went through each of the 3553(a) factors and sentenced Casey to 100 months, near the bottom of the 97–121 month recommended sentence under the Guidelines. Because Casey does not adequately rebut the presumption of reasonableness that is granted to sentences that are within the applicable Guidelines range, we hold that Casey Redmond's sentence was substantively reasonable.

## VI.

For the foregoing reasons, we **AFFIRM** the order denying Michael Redmond's motion to suppress and **AFFIRM** Casey Redmond's sentence.