RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee*,

                    *v.*                                      Nos. 12-2338/2339

GERALD LEE DUVAL, JR. (12-2338) and
JEREMY DUVAL (12-2339),
                              *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20594—David M. Lawson, District Judge.

Argued: January 23, 2014

Decided and Filed: February 7, 2014

Before: COLE, GILMAN, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Andrew B. Greenlee, BROWNSTONE, P.A., Winter Park, Florida, for
Appellants. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit,
Michigan, for Appellee. **ON BRIEF:** Andrew B. Greenlee, BROWNSTONE, P.A.,
Winter Park, Florida, for Appellants. Patricia Gaedeke, UNITED STATES
ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Gerald Lee Duval, Jr., along with his
two adult children—Jeremy Duval and Ashley Duval—grew marijuana on Gerald's farm
in southeast Michigan. As a "patient" under Michigan's Medical Marihuana Act
(MMMA), Gerald was permitted to grow a maximum of 12 marijuana plants for personal
use. His children, however, were registered as both "patients" and "caregivers" under
the MMMA, which allowed them to grow up to 72 marijuana plants apiece. In June and

1

August 2011, law-enforcement officers executed two separate search warrants at Gerald's farm, confiscating more than 100 marijuana plants, various drug paraphernalia, assorted firearms, and several registration documents related to the Duvals' ability to cultivate, use, and distribute marijuana under the MMMA.

In September 2011, the government filed an indictment charging Gerald and Jeremy with one count of conspiracy to manufacture 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a) and 846; with two counts of manufacturing 100 or more marijuana plants with the intent to distribute the drug, in violation of 21 U.S.C. § 841(a)(1); with one count of maintaining a drug premises, in violation of 21 U.S.C. § 856(a)(1); and with one count of possessing a firearm in the furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). The government also charged Gerald with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Ashley was never charged. For the purpose of this opinion, we will refer to Gerald and Jeremy collectively as "the Duvals."

After a nine-day trial in April 2012, the jury returned guilty verdicts against the Duvals on the drug-related counts, but acquitted them on the counts related to the firearms. The district court then sentenced Gerald to 120 months of incarceration, in addition to an eight-year term of supervised release and a fine of $12,500. Jeremy was sentenced to 60 months of incarceration, together with a four-year term of supervised release.

The Duvals contend on appeal that (1) the district court erred in concluding that their compliance with the MMMA was irrelevant to the application for a search warrant; and (2) the indictment does not allege a federal crime because Jeremy and Ashley are registered "caregivers" under the MMMA and because Jeremy qualifies under the "practitioner exception" of the Controlled Substances Act, 21 U.S.C. § 802(21). For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to both issues.

## I. BACKGROUND

**A.     Factual background**

In May and June 2011, Monroe County Sheriff's Deputy Ian Glick investigated tips from a confidential informant (CI) that led him to conduct surveillance on Gerald's farm and ultimately to apply for and execute two separate search warrants that are at issue in this case.  The government contends that Deputy Glick simply conducted a routine investigation to corroborate information supplied by the CI, but the Duvals argue that as duly registered marijuana patients and caregivers under state law, they were the targets of an investigation for which the conclusion was never in doubt.  According to the Duvals, Deputy Glick and other law-enforcement officers knew that the Duvals possessed and grew marijuana because agents from the Office of Monroe Narcotics Investigations (OMNI) visited the farm in 2010 and offered advice on how to comply with the MMMA.

Deputy Glick was assigned to OMNI, an alliance of state and local law-enforcement officers directed by the Drug Enforcement Agency (DEA), from 2004 to 2007, but was a Task Force Officer working directly with the DEA when his office received a tip that Gerald was growing marijuana on his farm.  The tip came from a CI who claimed to have seen marijuana growing in two greenhouses on the farm and to have heard Gerald bragging about growing and selling marijuana.  Moreover, the CI claimed that the greenhouses were surrounded by tall chain-link fences and patrolled by Rottweilers.

Deputy Glick took immediate action to substantiate the CI's tip.  He consulted the Law Enforcement Information Network (LEIN) and learned that Gerald had a federal felony conviction for cocaine trafficking.  This prior conviction prohibited Gerald from qualifying as a caregiver under Michigan law, Mich. Comp. Laws § 333.26423(g) (2008), a status that Gerald never claimed.  Deputy Glick then decided to conduct surveillance on the farm.

Along with Reserve Deputy Joe Schumaker, Deputy Glick traveled to a tract of land adjacent to the farm. From that vantage point, the officers saw two greenhouses matching the CI's description. Eight-foot-high chain-link fences topped with barbed-wire surrounded the greenhouses. The greenhouses themselves were constructed from opaque plastic slats and were almost completely bordered by a three-foot-tall layer of burlap that ran along the perimeters of the buildings. Open ventilation windows located slightly above the layer of burlap material provided a view into the interiors of the greenhouses.

Using binoculars to peer through the ventilation windows from a distance of approximately 75 to 100 yards, Deputy Glick and Reserve Deputy Schumaker observed a "large quantity" of marijuana plants. In addition, Reserve Deputy Schumaker testified that open doors on the southern sides of the greenhouses provided an unobstructed view of the marijuana. Deputy Glick subsequently prepared a search-warrant affidavit based on the CI's now-corroborated tip and his own personal observations. A Monroe County magistrate issued a search warrant on June 15, 2011.

Deputy Glick's affidavit in support of the June 15 search warrant included a description of the greenhouses. The two opaque structures, surrounded by barbed-wire fences, were allegedly constructed after OMNI officers told the Duvals in September 2010 that secure facilities were needed to comply with the MMMA. Although the Duvals claim that Deputy Glick provided this advice, other officers testified that Deputy Glick was neither a member of OMNI in September 2010 nor on duty on the date of the visit. Deputy Glick himself denied being present.

Regardless of whatever prior encounters occurred between OMNI and the Duvals, law-enforcement officers searched the farm on June 16, 2011. In particular, the officers searched a two-story house, the two greenhouses, and a large pole barn, seizing 144 live marijuana plants, seven firearms, and various other items related to marijuana cultivation. No criminal charges, however, were brought against the Duvals under state or federal law at that time.

But the June 16 search did not end the investigation.  On July 18, 2011, the CI again contacted Deputy Glick and reported that the Duvals had replanted marijuana in the greenhouses.  Agent Brendan Gillen and Task Force Agent Jeremy Langenderfer subsequently traveled to the same tract of land adjacent to the farm and saw marijuana "growing the length of both greenhouses."  After verifying the information, Deputy Glick obtained another warrant to search the farm—only this time he sought the warrant in federal court based on probable cause for federal narcotics violations.  Law-enforcement officers executed this second search warrant on August 9, 2011, seizing 67 live marijuana plants from the two greenhouses.

**B.     Procedural background**

In November 2011, the Duvals jointly requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), for the purpose of suppressing the evidence gathered during the June 16 and August 9 searches.  The district court held a hearing on the Duvals' motion to suppress in January 2012, ordering the parties to file supplemental briefing and provide additional photographic evidence related to the searches.

A second evidentiary hearing was held in March 2012.  The district court denied the motion to suppress at the conclusion of the second evidentiary hearing.

After a nine-day trial in April 2012, the jury found the Duvals guilty on the drug-related counts in the indictment, but not guilty on the counts related to the firearms.  On October 1, 2012, the district court sentenced the Duvals, who shortly thereafter filed timely notices of appeal.

## II. ANALYSIS

**A.     Validity of the search warrants**

The Duvals argue that the June 15, 2011 search warrant is invalid because Deputy Glick made deliberate "material omissions" concerning the Duvals' status as registered patients and caregivers under Michigan law in order to obtain the warrant.  Under their theory, the August 9, 2011 search warrant should also be declared invalid

because it was obtained based on evidence discovered under the first warrant. According to the Duvals, their status under the MMMA is a material fact that would have undermined a finding of probable cause, particularly considering that OMNI officers visited the farm in 2010 and provided advice on how to comply with the MMMA. The Duvals specifically argue that "as a matter of Michigan law, police must include clear evidence of a person's compliance with the MMMA in an affidavit because the inclusion of this information would destroy probable cause."

Under *Franks*, 438 U.S. 154, a search warrant is invalid when the supporting affidavit contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth. *Id.* at 155–56. *Franks* also extends to circumstances in which an officer omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause. *See United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc) ("[T]his court has recognized that material omissions [from an affidavit] are not immune from inquiry under *Franks*.") (second alteration in original and internal quotation marks omitted). "[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause." *Id.* at 596–97 (emphasis in original).

Although the government argues that the Duvals waived this issue by failing to raise it in the district court, we reject the government's procedural objection. The Duvals' counsel sought to recall Deputy Glick and Reserve Deputy Schumaker at the suppression hearing to ascertain the officers' knowledge about "agents who went out to the Duval property in September 2010 . . . and actually gave [the Duvals] advice as to what they needed to do to be in strict compliance with [the MMMA]." If the deputies had known that OMNI officers had visited and advised the Duvals in 2010, the Duvals argued, "that taints [the deputies'] testimony . . . because they went out there knowing that there was marijuana out there already, because they knew that they had given them permission to grow marijuana."

Although the statements by defense counsel do not explicitly reference "material omissions" or similar phrases, the statements can be fairly understood as requests to probe the extent to which the deputies previously knew of the Duvals' marijuana-growing operation and why that information was not mentioned when applying for a search warrant.  Our conclusion is consistent with the district court's order stating that the purpose of the *Franks* hearing was to decide whether "the affidavits used to secure the search warrants contain false statements *or material omissions* that were inserted *or omitted* with intentional or reckless disregard for the truth to establish probable cause to search."  (emphasis added).  We thus conclude that the Duvals have preserved this issue for appellate review.

Turning now to the merits, Deputy Glick's affidavit in support of the application for a search warrant provides, in pertinent part, as follows:

> On May 06, 2011, the Resident Agent in Charge of the Toledo Resident Office (Rodel Babasa) received information from the Detroit DEA office regarding illegal drug activity involving Gerald Lee Duval . . . of Petersburg, MI.

> The tip stated that Gerald DUVAL had constructed one large green house approximately 100ft x 50ft. and has begun construction on a second green house of the same size.  There was also a chain link fence approximately 8ft high with barbed wire topping the fence surrounding the green houses and Rottweiler's [sic] roaming around inside of the fence.  Through training and experience it is known to the Affiant that is it extremely unusual for a person (s) to put a fence with barbed wire and to use dogs to protect a green house (s) [sic].  It is also known to Affiant that people who traffic in narcotics will go to great lengths to protect their product.

> The Confidential Source also informed the DEA that Gerald DUVAL, [sic] has been bragging that he is growing and selling medical marijuana and that is how he payed [sic] for his new Ford F-150 Raptor custom pick-up truck.

> The Confidential Source also stated that two or three times a week he/she could hear shooting of semi-automatic rifles from the DUVAL property.  Through training and experience it is known to Affiant that people who traffic in narcotics will keep guns to protect themselves and their illegal narcotics business.

A check on LEIN (Law Enforcement Information Network), [sic] showed Gerald DUVAL . . . to have a federal felony conviction for trafficking in Cocaine from 1988. The investigating agency for this case was DEA Detroit Division.

Under the Michigan Medical Marijuana Program Definition Section 333.101 paragraph 15 . . . [i]t states "Primary Caregiver means a person who is at least 21 years old and who has agreed to assist with patients [sic] medical use of Marijuana and who has never been convicted of a felony involving illegal drugs".

Due to Gerald Duval's prior felony conviction he cannot be a "Care Giver" under the Michigan Medical Marijuana Laws.

On June 13th 2011, Task Force Agent Glick spoke with the Confidential Source regarding the Marijuana growing in the green houses. The CS reported that he/she had seen large planter pots with marijuana plants growing in them. The CS held out their [sic] arms in a circle describing how big the planters where [sic] that held the growing Marijuana and further described the plants to be about chest high in height.

On June 13th 2011, the Affiant (Task Force Agent Glick) and Reserve Deputy Schumaker where [sic] able to observe two a [sic] large green house approximately 100 ft in length and 50ft wide and surround [sic] by 8ft high chain link fence topped with barb wire located behind . . . Ida Center Road. Officer also observed a large quantity of Marijuana growing the length of both green houses. The plants where [sic] approximately three to four feet in height.

According to the Duvals, Deputy Glick's failure to include information concerning the OMNI officers' previous visit to the farm was a deliberate and material omission that undermined the validity of the search warrant. The Duvals principally rely on *People v. Brown*, 825 N.W.2d 91 (Mich. Ct. App. 2012), in making this argument, but their reliance is misplaced. *Brown* addressed a defendant who sought to suppress marijuana obtained during the search of his home, claiming that "the MMMA made it legal to possess and grow certain amounts of marijuana and, thus, the statement in the affidavit that defendant was growing marijuana was insufficient to provide the police officers with probable cause that a crime had been committed." *Id.* at 92. The Michigan Court of Appeals rejected the defendant's argument, holding that "even after the enactment of the MMMA, a search-warrant affidavit concerning marijuana *need not provide specific facts pertaining to the MMMA*, i.e., facts from which a magistrate could

conclude that the possession, manufacture, use, creation, or delivery is specifically not legal under the MMMA." *Id.* at 93 (emphasis added).

Ignoring this holding, the Duvals instead rely on dictum in one of *Brown*'s footnotes, which provides that "if the police do have *clear and uncontroverted evidence* that a person is *in full compliance with the MMMA*, this evidence must be included as part of the affidavit because such a situation would not justify the issuance of a warrant." *Id.* at 95 n.5 (emphasis added). The Michigan Court of Appeals presumably intended for this language to constitute a narrow exception to the general rule that evidence pertaining to the MMMA need not be included in a search-warrant affidavit. *See id.* (stating that the exception is intended to address "any potential (however unlikely) for police overreach in attempting to obtain search warrants").

Furthermore, Deputy Glick did not have "clear and uncontroverted evidence" that the Duvals were in full compliance with the MMMA when he applied for the search warrant. Deputy Glick was not a member of OMNI when the officers from that unit visited the Duvals in September 2010, he was not present during the visit, and the visiting officers did not speak with Deputy Glick about their interactions with the Duvals. Viewing this evidence in the light most favorable to the government, which we must do when reviewing the denial of a motion to suppress, *see United States v. Stubblefield*, 682 F.3d 502, 505 (6th Cir. 2012), leads to the conclusion that Deputy Glick did not have "clear and uncontroverted evidence" that the Duvals were in full compliance with the MMMA when he applied for and executed the search warrant.

Indeed, the information that Deputy Glick had when he applied for the search warrant suggests just the opposite. Deputy Glick's investigation, for example, uncovered Gerald's prior felony conviction, which prohibited Gerald from qualifying as a "caregiver" under the MMMA. This fact, combined with the number of marijuana plants that Deputy Glick observed in the greenhouses, supports the inference that Gerald did not satisfy the "very limited, highly restricted exception to the statutory proscription against the manufacture and use of marijuana in Michigan." *Brown*, 825 N.W.2d at 94 (internal quotation marks omitted).

Because Deputy Glick did not know that OMNI officers had provided advice to the Duvals in 2010 about complying with the MMMA, his failure to include that information could not have been deliberate.  The Duvals, however, attempt to impute the "collective knowledge" of "other OMNI team members" to Deputy Glick.  "[T]he collective knowledge of agents working as a team is to be considered together in determining probable cause."  *United States v. Woods*, 544 F.2d 242, 259–60 (6th Cir. 1976); *see also United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012) ("Probable cause for arrest may emanate from collective police knowledge.").

"Working as a team" is also conceptualized as agents working "in close communication with one another."  *Woods*, 544 F.2d at 260.  If agents are so working, the group's knowledge of a fact may be considered by a reviewing court, "not just the knowledge of the individual officer who physically effected the arrest."  *Id.*  The collective-knowledge doctrine "recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another."  *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012) (applying the collective-knowledge doctrine when officers conducting a *Terry* stop had "no independent basis to target" the defendant, but rather were acting solely on another officer's request) (internal quotation marks omitted).

But the collective-knowledge doctrine does not apply in this case because there is no evidence that the OMNI officers communicated with Deputy Glick, either directly or indirectly, about the Duvals' registration status under Michigan law.  *See id.* (concluding that the collective-knowledge doctrine may apply by "direct communication or indirect communication").  As previously stated, Deputy Glick was not present when members of the task force visited the Duvals in September 2010, and none of the OMNI officers who visited the Duvals in 2010 told Deputy Glick of the visit.  Nor was Deputy Glick a member of OMNI during that time; he was assigned to road patrol from March 2007 to January 2011.  Deputy Glick instead had his own "independent basis" to target the Duvals—he had personally observed marijuana growing in the two greenhouses, which was consistent with the CI's tip.  Based on all this information, which must be

considered in the light most favorable to the government, the collective-knowledge doctrine does not apply in this case.

The Duvals next argue that the June 15 search warrant is invalid because Deputy Glick applied to a state magistrate rather than to a federal magistrate judge, allegedly in violation of Rule 41(b) of the Federal Rules of Criminal Procedure. Under Rule 41(b)(1), "a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district." The Duvals argue that the warrant is void because Deputy Glick—who was detailed to a federal agency while investigating the Duvals—applied to a state magistrate for the warrant without any showing that a federal magistrate judge was not "reasonably available." *See United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001) ("[W]hen a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void *ab initio*.").

The Duvals' argument on this issue lacks merit. Deputy Glick was at the time on detail with the DEA, meaning that he was essentially a sheriff's deputy working on issues of "mutual concern" with a federal agency. *See* 5 U.S.C. § 3372(a)(2) ("[T]he head of a Federal agency may arrange for the assignment of . . . *an employee of a State or local government* to [the federal agency] . . . for work of mutual concern to [the federal agency] and the State or local government. . . .") (emphasis added). As Deputy Glick testified at the suppression hearing, the effect of his position as a Task Force Agent is that he "can go State or Federal with an investigation." Deputy Glick exercised this flexibility to apply for and obtain a state search warrant based on Gerald's presumptive violation of state law, which precludes application of Rule 41 in this case. *See United States v. Bennett*, 170 F.3d 632, 635 (6th Cir. 1999) ("[T]he validity of a search warrant obtained by state officers for seizure of evidence ultimately used in a federal prosecution turns only on constitutional issues," not on Rule 41.)

The Duvals attempt to bolster their argument on this issue by highlighting a statement made by Deputy Glick suggesting that he sought a state search warrant

because doing so would be "easier at some points for some reasons." Based on this isolated statement (defense counsel did not ask any follow-up questions), the Duvals claim that Deputy Glick subverted federalism by seeking a state search warrant.

Deputy Glick, however, explained at the *Franks* hearing why he applied to a state magistrate despite the fact that he was on detail to the Toledo DEA office. He said that "we, at the time, did not know if we were going to go State or Federal with this investigation," and that his position afforded him flexibility in making that decision. Deputy Glick further stated that the decision to apply to a state magistrate for the search warrant was motivated by what was known at the time: that Gerald "was a convicted felon and the marijuana . . . was growing on his property . . . [and a] person who is a convicted felon or narcotics trafficker cannot be a caregiver and cannot possess more than twelve plants."

Deputy Glick's investigation turned up visual evidence that Gerald was growing an amount of marijuana far in excess of what Michigan law permitted him to grow alone, which does not render "federalism principles . . . meaningless" even if the prosecution was ultimately federal. We thus conclude that the district court did not err in refusing to suppress the evidence obtained during the June and August searches of the farm.

**B.      The Duvals both waived and forfeited the opportunity to challenge the sufficiency of the indictment**

The Duvals next argue, for the first time on appeal, that "[t]he indictment in this case is defective as a matter of law because Jeremy and Ashley cultivated the marijuana plants while serving as registered 'caregivers' under Michigan law" and because Jeremy qualifies under the "practitioner exception" of the Controlled Substances Act, 21 U.S.C. § 802(21). Because the indictment does not mention the Duval siblings' status as caregivers under the MMMA and contains "only a bare recitation of the [federal] statutory language," the Duvals argue that the indictment is insufficient to inform them of the specific conduct that is prohibited under federal law. The government responds that the Duvals waived this argument by failing to raise it before the district court.

Because the Duvals raise this issue for the first time on appeal, they may challenge the indictment's sufficiency only if the alleged defect is jurisdictional. *See United States v. Titterington*, 374 F.3d 453, 459 (6th Cir. 2004) (explaining that the statute of limitations is a nonjurisdictional affirmative defense that a defendant may waive); *see also United States v. Schaffer*, 586 F.3d 414, 421 (6th Cir. 2009) ("[E]ven if presented for the first time on appeal, claims of jurisdictional defects in the indictment are not waived."). A panel of this court recently held that the defendants waived their right to appellate review of the practitioner-exception issue when they entered unconditional guilty pleas, reasoning "[t]hat the indictment failed to negate a possible exclusion from criminal liability—i.e., the 'practitioner exception' to the definition of 'manufacture'—[but that this] does not render the indictment jurisdictionally defective." *United States v. Marcinkewciz*, No. 12-2441, 2013 WL 5788764, at *2 (6th Cir. Oct. 29, 2013).

Although waiver and forfeiture are distinct concepts, *see United States v. Olano*, 507 U.S. 725, 733 (1993), both apply in this case. The Duvals have waived review of this issue by conceding at oral argument that *Marcinkewciz* controls and forecloses their arguments. *See id.* ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted). In addition, the Duvals forfeited review of this issue by failing to raise it before the district court. *See id.* ("[F]orfeiture is the failure to make the timely assertion of a right."); *see also Marcinkewciz*, 2013 WL 5788764, at *3 ("[T]he 'practitioner exception' to liability for the manufacture of marijuana constitutes an affirmative defense that must be raised . . . by a defendant."). Consequently, we need not address the merits of the Duvals' arguments regarding the sufficiency of the indictment.

## III. CONCLUSION

For all the foregoing reasons, we **AFFIRM** the judgment of the district court.