RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ILYA KOVALCHUK,

*Plaintiff-Appellant*,

*v.*

CITY OF DECHERD, TENNESSEE,

*Defendant-Appellee*,

MATHEW WARD,

*Defendant*.

No. 23-5229

─────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:22-cv-00154—Travis Randall McDonough, District Judge.

Argued:  December 7, 2023

Decided and Filed:  March 18, 2024

Before:  CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Russell L. Leonard, Monteagle, Tennessee, for Appellant. Michael T. Schmitt, ORTALE KELLEY LAW FIRM, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Russell L. Leonard, Monteagle, Tennessee, for Appellant.  Michael T. Schmitt, ORTALE KELLEY LAW FIRM, Nashville, Tennessee, for Appellee.

GRIFFIN, J., delivered the opinion of the court in which GIBBONS, J., joined. CLAY, J. (pp. 10–17), delivered a separate dissenting opinion.

—————————————

**OPINION**

—————————————

GRIFFIN, Circuit Judge.

Defendant Matthew Ward, then an off-duty police officer for the City of Decherd, stopped plaintiff Ilya Kovalchuk, waved his police badge, and held Kovalchuk at gunpoint without any justification. Kovalchuk alleges that Ward violated his Fourth Amendment rights and that the City's failure to investigate Ward's background before hiring him caused Kovalchuk's injuries. Finding that Kovalchuk failed to adequately plead allegations supporting municipal liability, the district court dismissed the claims against the City. We affirm.

I.

The complaint alleges the following: Kovalchuk was driving his vehicle when Ward began driving "erratically" behind him and ordered him to pull over. Kovalchuk complied and exited his vehicle. Ward displayed his City of Decherd Police Department badge, pointed his handgun at Kovalchuk, and ordered him to get on the ground. Kovalchuk pleaded with Ward to put down the gun because Ward "was not on duty and was outside of his jurisdiction." In response, Ward screamed that he "was always on duty." Bystanders witnessing the altercation called the Rutherford County Sheriff's Department. Sheriff's deputies arrested Ward, and he was charged with aggravated assault. Kovalchuk alleges that he has "suffered severe emotional damage and mental anguish" following this incident.

When Chief Ross Peterson hired Ward, Chief Peterson ordered an investigator "not to consult [Ward's] references or previous employment." Had the investigator done so, Chief Peterson would have learned that, while employed at the Fort Walton Beach Police Department, Ward had "to resign due to concerns about his demeanor and professionalism as well as failing to complete [the department's] training program in its entirety." Chief Peterson also would have discovered that Ward had unspecified "issues" with another police department in Alabama prior to those with Fort Walton Beach. Although Kovalchuk pleads that a background check "would have revealed these red flags and prevented" the incident at issue, he alleges neither that a

thorough background investigation would have changed Chief Peterson's hiring decision nor that Ward had violent tendencies.

After the incident, Kovalchuk commenced this 42 U.S.C. § 1983 action against Ward and the City, alleging numerous federal civil rights and state-law claims. Following the district court's entry of a default judgment against Ward and the parties' stipulation dismissing many of Kovalchuk's claims, only his municipal liability claims against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), remained. The City moved to dismiss those claims under Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion. Kovalchuk timely appealed.

## II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level," and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). That means the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). If a plaintiff does not "nudge[] the[] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Twombly*, 550 U.S. at 570. When considering a motion to dismiss, we must accept as true all factual allegations but need not accept any legal conclusions. *See Napolitano*, 648 F.3d at 369. We review de novo a district court's grant of a motion to dismiss. *Lipman v. Bush*, 974 F.3d 726, 740 (6th Cir. 2020).

## III.

A municipality cannot be held liable under § 1983 simply because it employs a tortfeasor, nor can it be liable "for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*.").

Instead, a municipality may be held liable "only for '[its] *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). A plaintiff asserting a municipal liability claim under *Monell* "must connect the employee's conduct to a municipal 'policy' or 'custom.'" *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Brown*, 520 U.S. at 403). To do so, a plaintiff must demonstrate one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A plaintiff then "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

A.

At issue here is the district court's dismissal of three *Monell* claims: (1) failure to train, (2) failure to supervise, and (3) failure to screen. At oral argument, however, Kovalchuk's lawyer conceded that the complaint was deficient on all counts:

*Failure to train*

THE COURT: Isn't that fatal to your failure-to-train claim, if you don't know what training [Ward] received? I mean, how can you allege plausibly that [the City is] liable for failure to train when you don't know what training he had?

PLAINTIFF'S COUNSEL: We don't know what training he had because we don't know when he was hired, and we don't know what training he missed in Fort Walton. I have to admit, I think the training theory is gone.

Oral Arg. at 19:53–20:18.

*Failure to supervise*

THE COURT: How about the failure-to-supervise claim, is that gone too?

PLAINTIFF'S COUNSEL: I think that's gone. I truly do.

*Id.* at 20:22–20:28.

*Failure to screen*

PLAINTIFF'S COUNSEL: Yes, I read *Twombly*, and you are correct. That's what it says. And I realize that that is why [the complaint] to some extent is deficient. . . . So all I'm saying is this, is it plausible that Mr. Ward's background, if it had been checked would have shown that, in fact, he was not a proper officer to hire? We think yes.

THE COURT: Not a proper officer, that it's highly likely that he would have engaged in this 1983 violative conduct.

PLAINTIFF'S COUNSEL: And we think discovery would show that, your honor.

THE COURT: So you basically admit to me that your complaint doesn't have the facts in there that you really need.

PLAINTIFF'S COUNSEL: We don't and can't until we have discovery.

*Id.* at 11:33–12:41; *see also id.* at 9:15–29. Kovalchuk has therefore abandoned his appeal. *See, e.g.*, *Deane Hill Country Club, Inc. v. City of Knoxville*, 379 F.2d 321, 323 (6th Cir. 1967) ("This latter contention was abandoned by plaintiff at oral argument before this court and it therefore will not be considered."); *cf. United States v. Duval*, 742 F.3d 246, 255 (6th Cir. 2014) ("The Duvals have waived review of this issue by conceding at oral argument that *Marcinkewciz* controls and forecloses their arguments.").

B.

These concessions aside, because Kovalchuk's appeal and oral argument focused mainly on his failure-to-screen claim, we highlight further why this claim was not plausibly pleaded. For such a claim, a plaintiff must plead sufficient facts supporting the conclusion "that a municipal [hiring] decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. Unlike failure-to-train claims, which typically involve a pattern of unconstitutional conduct to establish deliberate indifference, *Burgess*, 735 F.3d at 478, failure-to-screen claims usually rest— as Kovalchuk's does here—on a single hiring decision, *Brown*, 510 U.S. at 408–10.[1]

---

[1]To the extent that Kovalchuk attempts to establish the City's deliberate indifference by showing a pattern of unconstitutional conduct in its hiring practices, such a pattern does not exist. Although Kovalchuk alleges that the City hired Tristan De La Cruz at the Decherd Police Department "without the proper protocols in place to check

For a "single hiring decision" by a municipal decisionmaker that resulted in a constitutional violation, which "can be a 'policy' that triggers municipal liability," there exists a "particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." *Id.* at 404, 410; *see also Siler v. Webber*, 443 F. App'x 50, 55 (6th Cir. 2011) (explaining the "potential pattern exception" created in *Brown*). To mitigate this danger, the Supreme Court in *Brown* set forth a stringent test: "To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability," the plaintiff alleging failure to screen must show that the decisionmaker was deliberately indifferent to the "known or obvious consequence" of the hiring decision and that the link between the applicant's background and the specific constitutional violation was sufficiently strong. 520 U.S. at 410–12. Simply choosing not to inquire into an applicant's background does not amount to deliberate indifference. *See id.* at 411. "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* As for the causation element of deliberate indifference, establishing that a hiring decision would likely result in any constitutional injury is insufficient to impose municipal liability. *Id.* at 412. Instead, the plaintiff must show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.*

*Brown* highlights how this exceedingly rigorous standard operates. There, a police officer seriously injured Jill Brown during a traffic stop, and she sought to hold the municipality liable for his use of excessive force. *Id.* at 399–401. Like Kovalchuk, Brown asserted that, had the municipality sufficiently investigated the officer's background—he "had a record of driving

---

his background," he does not allege that De La Cruz engaged in unconstitutional conduct, thereby failing to show a pattern of deliberate indifference by the City to constitutional violations by individuals whom it failed to adequately screen. *Cf. D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (holding that three prior instances of unconstitutional conduct by county employees were insufficient to establish a pattern of the municipality's deliberate indifference to unconstitutional conduct); *see also Connick*, 563 U.S. at 61 (explaining that a municipality may be deliberately indifferent only when "policymakers are on actual or constructive notice that a particular omission in their . . . program causes city employees to violate citizens' constitutional rights"). At most, Kovalchuk has shown two instances of negligent hiring by the City—only one of which resulted in unconstitutional conduct—not a pattern of deliberate indifference to the risk of unconstitutional conduct by its police officers.

infractions and had pleaded guilty to various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness"—it would not have hired the officer and therefore her alleged constitutional injuries would not have occurred. *Id.* at 401. That record, the Supreme Court concluded, was "inadequate" to hold the county liable:

> The fact that [the officer] had pleaded guilty to traffic offenses and other misdemeanors may well have made him an extremely poor candidate for reserve deputy. Had [the hiring official] fully reviewed [the officer's] record, he might have come to precisely that conclusion. But unless he would necessarily have reached that decision *because* [the officer's] use of excessive force would have been a plainly obvious consequence of the hiring decision, [the] inadequate scrutiny of [the officer's] record cannot constitute "deliberate indifference" to [Brown's] federally protected right to be free from a use of excessive force.

*Id.* at 413–14.[2]

Similar to *Brown*, the central question here is whether Chief Peterson's failure to adequately screen Ward's background was the moving force behind Ward's unconstitutional misconduct, and, as a result, Kovalchuk's injury.[3] According to the complaint, Chief Peterson, acting as "the final policymaker for the Decherd Police Department" and "as an agent for the City of Decherd," made the "deliberate choice to hire and retain" Ward even though he "should have known" that Ward was "unfit to be a police officer and to possess a deadly service weapon." Chief Peterson "ordered" his investigator not to consult Ward's background, which would have revealed that Ward's previous employer, the Fort Walton Beach Police Department, asked him to resign due to "concerns about his demeanor and professionalism," that Ward had failed to complete a training program at this previous employer, and that Ward had "issues" during his employment with another police department in Alabama.

---

[2]The fact that *Brown* ultimately involved a reversal of a jury verdict instead of evaluating the sufficiency of a complaint does not mean it is not controlling. First, *Brown* set forth the legal test for when a municipality may be constitutionally liable for failing to screen an applicant. 520 U.S. at 411–12. Second, there is no debating that *Brown*'s high standard applies at the motion-to-dismiss stage. *Cf. Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020).

[3]The City does not dispute, at least at the motion-to-dismiss stage, that Ward violated Kovalchuk's constitutional rights or that he was acting under color of state law. *See Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) ("A § 1983 claim must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." (internal quotation marks omitted)).

These ambiguous allegations, which merely allude to negligent hiring by the City, do not establish the necessary causal link for Kovalchuk's deliberate-indifference claim. Kovalchuk was required to plead facts plausibly alleging that a "known or obvious consequence" of the hiring decision was that "*this* officer" (Ward) "was highly likely to inflict the *particular* injury suffered by the plaintiff" (being held at gunpoint following an unconstitutional stop). *See id.* at 410, 412. Allegations of "issues," "concerns about [Ward's] demeanor and professionalism," and his "fail[ure] to complete [a] training program" fall short of plausibly linking the danger of hiring Ward to Kovalchuk being held at gunpoint by Ward following an unconstitutional stop. *See id.* at 411–12. More specifically, the mere fact that Ward may have been likely—even exceedingly likely—to commit unconstitutional conduct in general would not have put the City on notice that Ward would commit the "specific constitutional violation" here. *Id.* at 410–11 ("The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation."). The same can be said regarding Ward's predisposition to violence—that alone is insufficient under *Brown*. Based simply on the broad allegations in the complaint, Kovalchuk's failure-to-screen claim is not plausible. The district court did not err in dismissing this claim.

Kovalchuk contends that discovery would reveal more specific information on Ward's background, and in turn, that he was highly likely to engage in the particular conduct at issue. But a plaintiff cannot use discovery to bridge the gap between a deficient pleading and the possibility that a claim might survive upon further investigation. *See New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) ("[A] plaintiff may not use the discovery process to obtain the[] [necessary] facts after filing suit."). Put simply, a plaintiff is "not entitled to discovery" to determine whether a claim can survive past the pleading stage. *See, e.g.*, *Iqbal*, 556 U.S. at 686; *accord Estate of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 929 (6th Cir. 2013) ("[U]nder *Iqbal*, a complaint cannot survive a motion to dismiss—and plaintiffs cannot get discovery—unless the complaint shows that the defendant's wrongdoing is plausible, not just possible."); *Patterson v. Novartis Pharms. Corp.*, 451 F. App'x 495, 498 (6th Cir. 2011) ("The Supreme Court's decisions in *Twombly* and *Iqbal* do not permit a plaintiff to

proceed past the pleading stage and take discovery in order to cure a defect in a complaint.").[4] Kovalchuk cannot rely on speculation about what may be learned during discovery to defeat the City's motion to dismiss.

## C.

Ward's conduct here was egregious, and he undeniably victimized Kovalchuk. No citizen should ever have to face being unconstitutionally seized, let alone by an off-duty police officer who brandishes a firearm in an apparent incident of road rage. While we are sympathetic to Kovalchuk's plight, the pitfall in his case is his attempt to hold *the City* liable for *Ward's* misconduct. Ward's unconstitutional actions are not automatically attributable to the City, even if the City negligently hired Ward. To find otherwise would require us to contradict Supreme Court precedent by permitting the City to potentially be liable for its employee's actions via respondeat superior. *See Brown*, 520 U.S. at 410. And while adequately pleading a municipal liability claim without the benefit of discovery may be difficult, that task is hardly new. *See Iqbal*, 556 U.S. at 686. Perhaps Kovalchuk could have moved to file an amended complaint after further investigating his claims or in response to the City's motion to dismiss. But he did not, and we must analyze the allegations in the complaint before us, which deficiently pleaded a failure-to-screen claim.

## IV.

We affirm the judgment of the district court.

---

[4]True, in a case where we have found that a district court erroneously dismissed a different type of municipal liability claim, we referenced the plaintiffs' lack of discovery in our analysis; in that matter, however—which makes no mention of *Iqbal*'s "no-discovery" mandate—we focused not on the lack of discovery to support reviving the *Monell* claim, but rather on the substance of the complaint at issue. *See Lipman*, 974 F.3d at 748–49 ("Based on the facts alleged in the complaint, a juror could reasonably infer that . . . the county had a custom of allowing caseworkers to interview potential abuse victims in the presence of their alleged abusers. The original complaint alleges six different instances [of unconstitutional conduct]. At the motion-to-dismiss stage, without the benefit of discovery, these facts are enough to draw the reasonable inference that this custom was widespread . . . and known to policymakers within the county."); *cf. Genaw v. Garage Equip. Supply Co.*, 856 F. App'x 23, 29 (6th Cir. 2021) (reversing the district court's dismissal of a products liability dispute because "[t]he pleadings plainly demonstrate[d] the crux of" the plaintiff's claims, not because the plaintiff had not "had the benefit of full discovery").

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting. When hiring former police officer Mathew Ward, the City of Decherd (the "City") refused to review, or even consider, Ward's alarming history of employment infractions and job-hopping as a police officer. In fact, the City deliberately ordered that Ward's background should not be investigated and, in the same breath, entrusted Ward with the unbridled authority that accompanies a police badge and gun. Unsurprisingly, Ward subsequently used excessive force to unlawfully abuse, intimidate, and seize an innocent man, Plaintiff Ilya Kovalchuk. But when Kovalchuk turned to the federal courts for recourse, he did not see his constitutional rights vindicated. Instead, his claims were prematurely dismissed before they could even get through the gate—an error that the majority affirms today, effectively foreclosing the future consideration of municipal liability claims based on the failure to screen a police applicant's background. Because I would allow Kovalchuk's failure-to-screen allegations to proceed, I respectfully dissent.

## I. BACKGROUND

On June 13, 2021, Plaintiff Ilya Kovalchuk and an off-duty Decherd police officer, Mathew Ward, drove westbound in their respective vehicles on Interstate 24 in Rutherford County, Tennessee. Ward was driving in his personal vehicle, was not wearing his officer's uniform, and could not otherwise be identified as a police officer. After allegedly observing Kovalchuk speeding, Ward began driving erratically, precariously swerving next to Kovalchuk's vehicle and motioning for him to pull over. Regardless of which lane Kovalchuk drove in to avoid him, Ward continued in hot pursuit. Eventually, Kovalchuk called 911. After multiple cars were forced to swerve out of Ward's perilous path, Kovalchuk exited and pulled over at a safe location.

Once stopped, Kovalchuk stepped out of the vehicle to face his aggressor, leaving his pregnant wife in the passenger seat. Without explanation, Ward started screaming at Kovalchuk to "get on the ground," pointing his department-issued gun at Kovalchuk and holding up his

police badge.  Compl., R. 1-1, Page ID #6.  The contentious exchange drew multiple concerned bystanders to the scene.  Scared for his life, Kovalchuk flagged down one bystander to take a video and tried to reason with Ward, stating "you're not even on duty." *Id.*  However, Ward continued to aim his gun at Kovalchuk, replying "I'm always on duty." *Id.*  Only when the Rutherford County police arrived upon the scene to de-escalate the conflict did Ward finally put away his weapon.

As a result of these events, Ward was charged with aggravated assault.  Following the incident, Kovalchuk obtained counsel to analyze the hiring processes of the Decherd City Police Department and found that the Decherd police had never conducted a background check on Ward prior to hiring him.  To the contrary, Decherd Police Chief Ross Peterson ordered his subordinate employee "not to consult references or previous employment" for Ward. *Id.* at Page ID #7.  Had the Decherd police consulted Ward's references, they would have found that he was previously employed by the Fort Walton Beach Police Department, which had asked Ward to resign due to concerns about his demeanor, professionalism, and lack of training.  Additionally, had the Decherd police conducted a background check, they would have found further issues with Ward's prior employment at a second police department in Alabama.

Kovalchuk filed this 42 U.S.C. § 1983 action against Ward and the City of Decherd, arguing that the City's failure to investigate Ward's employment references and problematical background directly resulted in Kovalchuk's injuries—namely, the unlawful seizure of Kovalchuk in connection with the June 13, 2021 traffic stop.  The City thereafter filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which the district court granted in full.  Kovalchuk timely appealed.

## II.  DISCUSSION

### A.  Standard of Review

The Rule 12(b)(6) standard is not demanding.  We affirm 12(b)(6) dismissals only where plaintiffs have not alleged facts that are sufficient to state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The allegations must allow the court, using its judicial experience, "to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Importantly, even where "recovery [seems] very remote and unlikely," a complaint may survive a motion to dismiss. *Stratton v. Portfolio Recovery Assocs.*, 770 F.3d 443, 447 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 556). And because this action was brought under one of the civil rights statutes, this Court must "scrutinize such a dismissal with special care." *Lucarell v. McNair*, 453 F.2d 836, 838 (6th Cir. 1972); *see also Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 754 (6th Cir. 2023); *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009).

Although the majority purports to agree with these general principles, its onerous application of the plausibility standard misreads the pleading requirements delineated in *Twombly* and *Iqbal*. Instead of viewing these failure-to-screen allegations in the light most favorable to Kovalchuk, the majority jumps to premature conclusions regarding the City's ultimate liability, before affording Kovalchuk the opportunity to gather additional evidence to prove his claims. In doing so, the majority requires § 1983 litigants to surmount a nearly impossible hurdle to survive the early 12(b)(6) motion to dismiss stage.

## B. Analysis

Among other claims not relevant to the instant appeal, Kovalchuk's complaint asserted a Fourth Amendment claim under 42 U.S.C. § 1983 against the City, alleging various theories of municipal liability to hold the City accountable for Ward's unconstitutional actions. Kovalchuk's strongest claim against the City focuses on Chief Peterson's explicit command that his subordinates refrain from investigating Ward's background or employment history during the hiring process.[1] Although under *Monell* the City cannot be held vicariously liable for Ward's unconstitutional actions, Kovalchuk's complaint alleges more—that *the City's* deliberately

---

[1]During oral argument, Kovalchuk's counsel conceded that his complaint was deficient on Kovalchuk's failure-to-train and failure-to-supervise theories, and thus focused this Court's evaluation on his persuasive failure-to-screen theory of liability. Oral Arg. at 19:53–20:18; 20:20–20:28; 20:29−20:45. Contrary to the majority's completely unfair interpretation of Kovalchuk's alleged concessions, Kovalchuk certainly did not abandon his entire appeal at oral argument, as evidenced by the majority's subsequent backtracking and analysis of the merits of Kovalchuk's failure-to-screen claim. *Cf. Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 463 (4th Cir. 2013) ("The defendants cite no authority, nor can we find any, holding that an ambiguous statement made during oral argument waives an argument clearly raised in a brief."); *Bannister v. Delo*, 100 F.3d 610, 622 n.12 (8th Cir. 1996) (noting that the state's "comments at oral argument did not have sufficient formality or conclusiveness to be considered a judicial admission").

skeletal screening process in hiring Ward led to Kovalchuk's injuries. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). These allegations meet the necessary fault and causation standards to plausibly warrant imposing municipal liability, mandating that Kovalchuk's claims should be allowed to proceed.

Indeed, the Supreme Court expressly opened the door to the possibility that a municipality may be liable for failing to adequately screen if "a full review of [Ward's] record reveals that [his unconstitutional arrest] would be a plainly obvious consequence of the hiring decision." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 412–13 (1997). In the context of a hiring decision, *Brown* articulates that an eventual finding of municipal liability originates from allegations that a cover-to-cover background check would indicate "that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412. Contrary to the majority's premature conclusion that Kovalchuk has not "establish[ed]" this causation standard, Maj. Op. at 8, Kovalchuk's allegations regarding the City's deliberate dereliction of its investigative duties prior to hiring Ward permits the "reasonable inference" that the City was the moving force behind Kovalchuk's injuries. *Iqbal*, 556 U.S. at 678.

Viewing Kovalchuk's failure-to-screen claim in the light most favorable to him, as required at this stage, Chief Peterson ordered a subordinate officer not to investigate Ward's references or background throughout the hiring process. Thus, without consulting Ward's former employers or reviewing his employment history, Chief Peterson hired him and issued him a police badge and gun. Had Chief Peterson contacted Ward's listed references, he would have found that Ward had "issues" with not one, but at least *two* previous police departments. Compl., R. 1-1, Page ID #7. Specifically, the Fort Walton Beach Police Department asked Ward to resign "due to concerns about his demeanor and professionalism," as well as his failure to complete his training. *Id.* Based on these allegations, Kovalchuk claims that the City knew or should have known about the "systematic hiring and screening failure" allowing dangerous individuals to surreptitiously become police officers. *Id.*

The gravity of Chief Peterson's—and by extension, the City's[2]—deliberate choice cannot be overstated. Without so much as a call to either former police department employer, the City entrusted Ward with a police badge and a gun, imbued with the implicit authority to decide life or death of citizens. By rewarding the City's "head in the sand" strategy, the majority insulates the City from turning over a single piece of discovery, thereby endorsing and perpetuating the cyclical hiring of predatory police officers. The majority's approach permits those "wandering" police officers who are fired or forced to resign under threat of termination to nonetheless seek employment in nearby jurisdictions.[3] Even further, this misguided immunization of police hiring practices from liability strips away the City's incentive to competently hire police officers, which should be viewed as particularly imperative for employment that is accompanied by state power and the authority to wield deadly weapons. As Kovalchuk's complaint alleges, Ward burned through *two different* police departments prior to being hired by the Decherd Police Department. In the face of clear red flags, Chief Peterson ordered his subordinate to cease further background investigation of Ward and avoid finding out any additional information about him. And then, incomprehensibly, the City seeks to skirt its responsibility by subsequently purporting to be surprised that the unvetted "wandering officer" later brutalized an innocent citizen.

Indeed, this preventable scenario has appeared over and over again, and the majority today adds to this ever-growing list. To provide one example of many, Tamir Rice, a twelve-year-old child from Cleveland, faced a tragic death in 2014 at the hands of a "wandering officer" who was permitted to resign from his prior police department jobs and seek employment in nearby jurisdictions. The Cleveland Police Department subsequently failed to review the unfit officer's employment history, which would have revealed that he exhibited a "dangerous lack of composure" during his prior employment's firearms training. *See* William H. Freivogel & Paul Wagman, *Wandering Cops Shuffle Departments, Abusing Citizens*, The Associated Press (Apr.

---

[2]The City has not disputed that Chief Peterson was a designated policymaker or that he had final authority to act for the City in hiring matters. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986) (requiring official policymaker status to distinguish acts of the municipality from the acts of its employees).

[3]Nancy Leong, *Civil Rights Liability for Bad Hiring*, 108 MINN. L. REV. 1, 8 (Dec. 23, 2023) (explaining that job hopping is so common in law enforcement that "officers who jump jurisdictions are nicknamed 'wandering officers'"). According to one study, "wandering officers are far more likely . . . to be fired from their next job" and "more likely to receive complaints . . . for 'moral character violations.'" Ben Grunwald & John Rappaport, *The Wandering Officer*, 129 YALE L.J. 1676, 1687 (Apr. 2020).

28, 2021), https://apnews.com/article/michael-brown-business-police-reform-death-of-george-floyd-bfd018e3c12413f840482efca29ca6ba [https://perma.cc/57Z8-U8T3]. These unchecked warning signs proved true when the officer shot twelve-year-old Tamir to death while he was playing with a toy gun. *Id.* This kind of recurring tragedy is destined to persist if courts continue to provide municipalities with *de facto* immunity related to their police hiring decisions. *See* Grunwald & Rappaport, *supra* note 3, at 1681–83 (collecting examples, "each as shocking [and tragic] as the last").

The majority sweeps these commonsense conclusions under the rug and instead characterizes Kovalchuk's allegations as "ambiguous," explaining that they fail to "establish the necessary causal link." Maj. Op. at 8. In doing so, the majority requires much more than plausibility. Both the district court and the majority misunderstand Kovalchuk's burden at the incipient 12(b)(6) stage by holding that he did not "establish" or conclusively "show" causation under *Brown*. Maj. Op. at 8, 9; Dist. Ct. Memo. Op., R. 35, Page ID #133. But Kovalchuk's claims should not be cursorily discarded under the assumption that causation cannot be established or met. To be sure, Ward's issues with demeanor, professionalism, and training may not—at a later stage of litigation—rise to the demanding standard articulated in *Brown*[4]; however, Kovalchuk's complaint is not required to "establish" his entitlement to relief, nor is it required to convince the district court that his sought-after relief is probable. *See Lipman v. Budish*, 974 F.3d 726, 748 (6th Cir. 2020); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (noting that where general allegations embrace the specific facts needed to prove a claim, any weakness "will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6)"); *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 868 (6th Cir. 2020) (stating the same). The correct legal standard, plausibility, falls somewhere between possibility and probability, and the definition of this malleable middle ground relies upon "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

---

[4]Importantly, *Brown* reviewed the plaintiff's claims at a much later stage of litigation—the appeal of a jury verdict. *See Brown v. Bryan County*, 67 F.3d 1174, 1179 n.11 (5th Cir. 1995). Unlike the plaintiff in *Brown*, who was required to conclusively establish each element of his failure-to-screen claim, Kovalchuk must only allege facts that could plausibly meet the failure-to-screen standards.

Applying this lenient standard to Kovalchuk's allegations and drawing commonsense inferences, one can fairly conclude that a disaster of this nature was a highly predictable consequence of the City's actions. *See, e.g.*, *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015) ("The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." (quoting *Brown*, 520 U.S. at 409–10)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006). Just as the need for certain police officer training can be "so obvious" that failure to implement such training may be characterized as deliberate indifference, the need for certain screening procedures for new police hires can similarly be "so obvious" that the choice to ignore them may also rise to deliberate indifference to citizens' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). And just as *Brown* requires, Kovalchuk specifically alleged that Ward's references would have revealed—at a minimum—"concerns about his fitness as an officer," a lack of training, and "concerns about his demeanor and professionalism." Compl., R, 1-1, Page ID #7, 12. Without the benefit of discovery and with the vast majority of the evidence in Defendant's control, Kovalchuk's failure-to-screen allegations are more than sufficient to survive a 12(b)(6) motion. *See, e.g.*, *Lipman*, 974 F.3d at 748 (highlighting the plaintiff's lack of an opportunity to engage in discovery and holding that his complaint survived a 12(b)(6) motion by sufficiently alleging a *Monell* custom); *Genaw v. Garage Equip. Supply Co.*, 856 F. App'x 23, 29 (6th Cir. 2021) (reversing district court's order dismissing plaintiff's complaint and noting that plaintiffs had not been provided the benefit of full discovery).

Looking at Kovalchuk's complaint as a whole, it is plausible that Ward was highly likely to commit the instant constitutional violation, and that any semblance of screening procedures during the hiring process would have produced a different outcome. By concluding otherwise, the majority fails to construe the facts in the light most favorable to Kovalchuk and "fails to realize that we are not ruling on the ultimate issue of liability." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020). Particularly in the context of civil rights cases, this Court should not adhere to a standard that is dangerously akin to a probability test. Yet the majority today does exactly that, unconcernedly barring civil rights plaintiffs who allege failure-to-screen claims from ever making it past the first hurdle. Using this unfair standard, the

majority insulates government actors who deliberately turn a blind eye to the backgrounds and employment histories of their potential hires.

## III. CONCLUSION

Contrary to the majority's misplaced fear regarding the City's liability if we were to reverse the district court's decision, Maj. Op. at 9, Kovalchuk's plausible allegations should be permitted to move forward. Doing so at this stage of the litigation does not hold a municipality "liable" for any action. *Id.*; *see Ouza*, 969 F.3d at 289 (noting that considering the ultimate question of liability is inappropriate at the 12(b)(6) stage). Instead, allowing these allegations to proceed to the discovery phase simply affords often-vulnerable plaintiffs the opportunity to attempt to prove their civil rights claims in federal court, a forum historically relied upon for relief from governmental abuse. *See Monroe v. Pape*, 365 U.S. 167 (1961). Rather than the conclusive "smoking gun" evidence that the majority requires, the proper standard requires allegations that only "nudge[] [Kovalchuk's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Kovalchuk has met that burden in this case. Accordingly, the district court erred in dismissing Plaintiff's claims against the City based on a failure-to-screen theory of *Monell* liability. And the majority, in affirming the district court, improperly raises the plausibility bar presented in *Twombly* and *Iqbal*—to the detriment of present and future civil rights plaintiffs.

I therefore respectfully dissent.